## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOPE TAFET, LESLIE LEVITT-RASCHELLA and JANE LEFKOWITZ, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>HUDSON'S BAY COMPANY, SAKS FIFTH AVENUE LLC, and LORD & TAYLOR LLC,<br><br>            Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Hope Tafet, Leslie Levitt-Raschella, and Jane Lefkowitz (hereinafter, "Plaintiffs"), individually and on behalf of the Classes defined below, allege the following against Hudson's Bay Company ("HBC" or the "Company"), Saks Fifth Avenue LLC ("Saks") and Lord & Taylor LLC ("Lord & Taylor") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

### NATURE OF THE CASE

1.    Plaintiffs bring this class action case against HBC, Saks and Lord & Taylor for their failure to secure and safeguard consumers' personally identifiable information ("PII") which HBC collected from various sources in connection with the operation of its Saks and Lord & Taylor subsidiaries.

2.    HBC has acknowledged that a cybersecurity incident (the "Data Breach") occurred, resulting in the theft of its customers' PII, mainly consisting of credit card numbers

and other information sufficient for wrongdoers to make fraudulent charges to HBC customers' accounts. HBC issued the following press release (the "April 1, 2018, Press Release"):

> HBC Provides Information about Data Security Issue in Certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor Stores in North America
>
> April 01, 2018 11:50 AM Eastern Daylight Time
>
> NEW YORK & TORONTO--(BUSINESS WIRE)--HBC (TSX:HBC) today announced that it has become aware of a data security issue involving customer payment card data at certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores in North America. While the investigation is ongoing, there is no indication at this time that this affects the Company's e-commerce or other digital platforms, Hudson's Bay, Home Outfitters, or HBC Europe.
>
> The Company deeply regrets any inconvenience or concern this may cause. HBC wanted to reach out to customers quickly to assure them that they will not be liable for fraudulent charges that may result from this matter. HBC has identified the issue, and has taken steps to contain it. Once the Company has more clarity around the facts, it will notify customers quickly and will offer those impacted free identity protection services, including credit and web monitoring. HBC encourages customers to review their account statements and contact their card issuers immediately if they identify activity or transactions they do not recognize.
>
> The Company is working rapidly with leading data security investigators to get customers the information they need, and the investigation is ongoing. HBC is also coordinating with law enforcement authorities and the payment card companies.
>
> For further information, please visit https://www.saksfifthavenue.com/security-information/notice.html,https://www.saksoff5th.com/security-information/notice.html, or https://www.lordandtaylor.com/security-information/notice.html.
>
> In the coming days, customer care representatives will be available through a dedicated call center to provide further information. The call center information will be posted on the above websites at that time.

3.     The PII for Plaintiffs and the class of consumers they seek to represent was compromised due to Defendants' acts and omissions and its failure to properly protect its customers' PII.

4.     Defendants could have prevented the Data Breach. Instead, Defendants disregarded the rights of Plaintiffs and Class members by intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard PII, failing to take available steps to prevent and stop the breach from ever happening, and failing to monitor and detect the breach on a timely basis.

5.     As a result of the Data Breach, the PII of the Plaintiffs and Class members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class members, or likely to be suffered by Plaintiffs and Class members as a direct result of the Data Breach include:

        a.     unauthorized use of their PII;

        b.     theft of their personal and financial information;

        c.     costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

        d.     damages arising from the inability to use their PII;

        e.     loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late

charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

   f. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, the costs of purchasing credit monitoring and identity theft protection services, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

   g. the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being placed in the hands of criminals and already misused via the sale of Plaintiffs and Class members' information on the darkweb (the Internet black market) or elsewhere;

   h. damages to and diminution in value of their PII entrusted to HBC for the sole purpose of purchasing products and services from HBC; and

   i. the loss of Plaintiffs' and Class members' privacy.

  6. The injuries to the Plaintiffs and Class members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for PII.

  7. Further, Plaintiffs retain a significant interest in ensuring that their PII, which, while stolen, remains in the possession of Defendants, is protected from further breaches, and seeks to remedy the harms they have suffered on behalf of themselves and similarly situated consumers whose PII was stolen as a result of the Data Breach.

  8. Plaintiffs bring this action to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiffs seek the following remedies, among others: statutory damages under state and/or federal laws,

reimbursement of out-of-pocket losses, other compensatory damages, further and more robust credit monitoring services with accompanying identity theft insurance, and injunctive relief including an order requiring Defendants to implement improved data security measures.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. At least one Plaintiff and one Defendant are citizens of different states. There are more than 100 putative class members.

10.    This Court has personal jurisdiction over Defendants because they regularly conduct business in New York and has sufficient minimum contacts in New York. Defendants intentionally avail themselves of this jurisdiction by marketing and selling products and services in New York. Indeed, the April 1, 2018, Press Release was released from New York and Toronto.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because HBC maintains offices in this District (https://www3.hbc.com/press-release-container/hudsons-bay-company-to-open-saks-fifth-avenue-and-saks-off-5th-stores-in-lower-manhattan-combine-nyc-office-locations/) and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## THE DATA BREACH

12.    On April 1, 2018, Gemini Advisory LLC, a New York-based cybersecurity firm ("Gemini"), broke the news of the Data Breach.[1] The same day, the story was picked up by major news outlets and the Company issued the April 1, 2018, Press Release.

---

[1] https://geminiadvisory.io/fin7-syndicate-hacks-saks-fifth-avenue-and-lord-taylor

13.    HBC customers across the United States have suffered real and imminent harm as a direct consequence of HBC's conduct, which includes (a) refusing to take adequate and reasonable measures to ensure its data systems were protected; (b) refusing to take available steps to prevent the breach from happening; (c) failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard customers' personal and financial information; and (d) failing to provide timely and adequate notice of the data breach.

14.    As a result of the data breach, the personal information, which included, but may not be limited to, payment card data ("PCD"), of over 5 million HBC customers has been exposed to criminals for misuse. Additionally, the hacking syndicate which is selling the Class's PII is releasing records slowly, making it more likely more of the PII will be used by criminals. The window of compromise is believed to be May 2017 to the present.

15.    The injuries and potential future injuries suffered by Plaintiffs and the proposed Classes as a direct result of the data breach include, *inter alia*:

      a.    Unauthorized charges on their payment card accounts;

      b.    Theft of their personal and financial information;

      c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

      d.    Loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

e.     Costs associated with time spent and the loss of productivity from taking time to address and attempting to ameliorate, mitigate and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the data breach;

f.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their personal information and PCD being placed in the hands of criminals and already misused via the sale of Plaintiffs' and Class members' information on the Internet black market;

g.     Damages to and diminution in value of their personal and financial information entrusted to HBC for the sole purpose of making purchases at HBC and with the mutual understanding that HBC would safeguard Plaintiffs' and Class members' data against theft and not allow access to and misuse of their information by others;

h.     Money paid to HBC stores during the period of the data breach in that Plaintiffs and Class members would not have gone to HBC had HBC disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' personal information and PCD and had HBC provided timely and accurate notice of the data breach;

i.     Continued risk to their personal information and PCD, which remains in the possession of HBC and which is subject to further breaches so long as HBC continues to fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data in its possession.

## PARTIES

**Plaintiffs**

16.     Plaintiff Hope Tafet is a resident of New Jersey. She is (and was during the period of the data breach) a citizen of the State of New Jersey. She shopped at Saks Off 5th in New Jersey during the period of compromise and paid with a credit card issued by Saks. Plaintiff Tafet's personal "profile" was included in the information held by Saks which included information about "other" credit cards used for Saks purchases, including her American Express credit card information.

17.     Plaintiff Leslie Levitt-Raschella is a resident of New York. She is (and was during the period of the breach) a citizen of the State of New York. She shopped at Saks OFF 5TH and Lord & Taylor several times during the period of compromise and each time paid with a debit card.

18.     Plaintiff Jane Lefkowitz is a resident of Florida. She is (and was during the period of the data breach) a citizen of the State of Florida. She shopped at Saks and Saks OFF 5TH several times during the period of compromise and each time paid with a credit card.

19.     Plaintiffs would not have used their credit or debit cards to make purchases at HBC—indeed, they would not have shopped at HBC at all during the period of the data breach— had HBC told them that it lacked adequate computer systems and data security practices to safeguard customers' personal and financial information from theft. HBC also failed to provide Plaintiffs with timely and accurate notice of the data breach.

20.     Each of the Plaintiffs suffered actual injury from having his or her personal information and PCD compromised and/or stolen as a result of the data breach.

21.     Each of the Plaintiffs suffered actual injury and damages in paying money to and purchasing products from HBC during the data breach that they would not have paid or

purchased had HBC disclosed that it lacked data security practices adequate to safeguard customers' personal and financial information and had HBC provided timely and accurate notice of the data breach.

22.    Each of the Plaintiffs suffered actual injury in the form of damages to and diminution in the value of his or her personal and financial identity information—a form of intangible property that each of the Plaintiffs entrusted to HBC for the purpose of making purchases at HBC and which was compromised in and as a result of the data breach.

23.    Each of the Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by his or her personal and financial information being placed in the hands of criminals who have already misused such information stolen in the data breach via sale of Plaintiffs' and Class members' personal and financial information on the Internet black market.

24.    Each of the Plaintiffs suffered actual injury in the form of time spent dealing with fraud resulting from the data breach and/or monitoring their accounts for fraud.

25.    Each of the Plaintiffs suffered actual injury in the form of fraudulent charges and the loss of use of funds while disputing such charges and, in some instances, additional damages resulting from such loss of use.

26.    Plaintiffs have a continuing interest in ensuring that their private information, which remains in the possession of HBC, is protected and safeguarded from future breaches.

27.    None of the Plaintiffs who suffered a loss of use of their account funds, or who had restrictions placed on their accounts, as a result of the data breach was reimbursed for the loss of access to or restrictions placed upon their accounts and the resulting loss of use of their own funds.

**Defendants**

28.     Defendant HBC is a Canadian corporation amalgamated under the Canada Business Corporations Act and domiciled in Canada. The Company owns and operates department stores in Canada and the United States under Hudson's Bay, Lord & Taylor, Saks Fifth Avenue, Saks Fifth Avenue OFF 5TH (sometimes "Saks Off 5th" or "Saks Off Fifth"), Find @ Lord & Taylor, Gilt and Home Outfitters banners. In Europe, its banners include Galeria Kaufhof, Galeria INNO, Sportarena, Saks Fifth Avenue OFF 5TH Europe and Hudson's Bay Europe, together "HBC Europe".

29.     Defendant Saks Fifth Avenue LLC is a Massachusetts Domestic Limited Liability Company which is registered in New York State and maintains offices in this District at 12 EAST 49th Street, New York, NY 10017, among other locations.

30.     Defendant Lord & Taylor LLC is a Delaware Domestic Limited Liability Company which is registered in New York State and maintains offices in this District, among other locations.

31.     All Defendants are referred to herein as "HBC" because Saks Fifth Avenue LLC and Lord & Taylor LLC are subsidiaries of HBC.

## BACKGROUND

32.     In a debit or credit card purchase transaction, card data must flow through multiple systems and parties to be processed. Generally, the cardholder presents a credit or debit card to a retailer to pay for merchandise. The card is then "swiped" and information about the card and the purchase is stored in the retailer's computers and then transmitted to the acquirer or processor (i.e., the retailer's bank). The acquirer relays the transaction information to the payment card company, who then sends the information to the issuer (i.e., cardholder's bank).

The issuer then notifies the payment card company of its decision to authorize or reject the transaction, as shown by the graphic below:[2]



| 1 | The consumer selects a card for payment. The cardholder data is entered into the merchant's payment system, which could be the point-of-sale (POS) terminal/software or an e-commerce website. |
| 2 | The card data is sent to an acquirer/payment processor, whose job it is to route the data through the payments system for processing. With e-commerce transactions, a "gateway" provider may provide the link from the merchant's website to the acquirer. |
| 3 | The acquirer/processor sends the data to the payment brand (e.g. Visa, MasterCard, American Express, etc.) who forward it to the issuing bank/issuing bank processor |
| 4 | The issuing bank/processor verifies that the card is legitimate, not reported lost or stolen, and that the account has the appropriate amount of credit/funds available to pay for the transaction. |
| 5 | If so, the issuer generates an authorization number and routes this number back to the card brand. With the authorization, the issuing bank agrees to fund the purchase on the consumer's behalf. |
| 6 | The card brand forwards the authorization code back to the acquirer/processor. |
| 7 | The acquirer/processor sends the authorization code back to the merchant. |
| 8 | The merchant concludes the sale with the customer. |

33. There are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen: pre-authorization when the merchant has captured a consumer's data and it is waiting to be sent to the acquirer; and post-authorization when cardholder data has been sent back to the merchant with the authorization response from the acquirer, and it is placed into some form of storage in the merchant's servers.

34. Encryption mitigates security weaknesses that exist when cardholder data has been stored, but not yet authorized, by using algorithmic schemes to transform plain text information into a non-readable format called "ciphertext." By scrambling the payment card data the moment it is swiped, hackers who steal the data are left with useless, unreadable text in the place of payment card numbers accompanying the cardholder's personal information.

---

[2] *See* "Payments 101: Credit and Debit Card Payments," a white paper by First Data, at: https://www.firstdata.com/downloads/thought-leadership/payments101wp.pdf.

35.    While HBC has indicated in the April 1, 2018, Press Release that it will offer those impacted free identity protection services, including credit and web monitoring, credit monitoring is of no actual value to customers as a preventative measure because it is reactionary—it does nothing to prevent fraud in the first instance. As reported on *Krebs*, a leading security website:[3]

> [Credit monitoring services] are basically PR vehicles for most of the breached companies who offer credit report monitoring to potentially compromised consumers… it does absolutely nothing to compensate for the fact that a criminal stole credit card mag stripe account… [Credit monitoring services] only give consumers limited help with a very small percentage of the crimes that can be inflicted on them… [a]nd consumers can get most of that limited help for free via the government website or free monitoring from a breached entity where their data inevitably was compromised.

36.    As similarly reported in the *Chicago Tribune*, retailers offering credit monitoring services and instructing their customers to check their credit reports in the wake of a data breach is "bad advice" because "[p]ayment card breaches have nothing to do with credit reports."[4] As one security expert noted, offering credit monitoring "seems to be the knee-jerk reaction" after a breach but "makes no sense at all." *Id.* The biggest concern is that credit monitoring offers customers a false sense of security but in reality offers little protection once the customer's personal information is exposed. *Id.*

---

[3] "Are Credit Monitoring Services Worth It?," Krebs on Security, 03/19/14, at https://krebson security.com/2014/03/are-credit-monitoring-services-worth-it/comment-page-1/.

[4] "Why credit monitoring will not help you after a data breach," *Chicago Tribune*, 08/15/14, at http://www.chicagotribune.com/business/chi-why-credit-monitoring-will-not-help-you-after-a-data-breach-20140815-story.html.

37.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal information:[5]



38.     Plaintiffs and the Class have experienced one or more of these harms as a result of the data breach.

39.     HBC's offer of credit monitoring to customer's whose personal information was exposed will also likely be inadequate because it will not continue long enough. There may be a time lag between when harm occurs versus when it is discovered, and also between when personal information or PCD is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[6]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit

---

[5]   Source: "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/17, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.

[6]   "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown", GAO, June 2007, at: https://www.gao.gov/assets/270/262904.html.

identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

40.     It seems clear that entire batches of stolen information have yet to be dumped on the black market, as discussed below, meaning HBC customers could be at risk of fraud and identity theft for years into the future.

## **STATEMENT OF FACTS**

41.     HBC, through its subsidiaries, owns and operates department stores throughout the United States. For its fiscal year 2017, which ended February 3, 2018, HBC generated retail sales of CAD$6.682 billion in the United States. *See* HBC's 2017 Annual Consolidated Financial Statements, (filed with the Canadian Securities Administrators ("CSA") on or about March 28, 2018).[7] As of March 2017, HBC operated more than 470 stores under banners such as the Bay, Saks Fifth Avenue, Lord & Taylor, Gilt and Saks Off 5th.

42.     The Data Breach is particularly egregious. In March of 2017, HBC admitted that the emails addresses and phone numbers of some Saks Fifth Avenue customers were exposed online accidentally over a weekend, and that the exposure was connected to a product wait-list for Saks.com. In response to this data breach, HBC promised that it would "continually review and enhance security" on its website.

43.     The breach comes as HBC is struggling to improve its financial performance because a tough retail environment has weighed on sales and margins. In June of 2017 HBC launched a transformation plan to, *inter alia*, cut costs. As part of this transformation plan, it appears that HBC chose not to sufficiently invest in the technology to encrypt payment card data

---

[7]   https://www.sedar.com/GetFile.do?lang=EN&docClass=5&issuerNo=00033738&issuerType=03&projectNo=02747063&docId=4283689

at point-of-sale to make its customers' data more secure but, instead, focused its technology budget on other systems which had more direct impact on the company's bottom line.

44.    On April 1, 2018, Gemini reported:

**Key Judgements**

• On March 28, 2018, a JokerStash hacking syndicate announced the release for sale of over five million stolen credit and debit cards

• In cooperation with several financial organizations, we have confirmed with a high degree of confidence that the compromised records were stolen from customers of Saks Fifth Avenue and Lord & Taylor stores.

• We estimate the window of compromise to be May 2017 to present.

• Based on the analysis of the available data, the entire network of Lord & Taylor and 83 Saks Fifth Avenue locations have been compromised. The majority of stolen credit cards were obtained from New York and New Jersey locations.

• As of this writing, approximately 125,000 records have been released for sale, although we expect the entire cache to become available in the following months.

**Executive Summary**

On March 28, 2018, a notorious hacking JokerStash syndicate, also known as Fin7 announced the latest breach of yet another major corporation, with more than five million stolen payment cards offered for sale on the dark web. Several large financial institutions have confirmed that all tested records had been used before at Saks Fifth Avenue, Saks Fifth Avenue OFF 5TH, a discounted offset brand of luxury Saks Fifth Avenue stores, as well as Lord & Taylor stores.

Although at this moment it is close to impossible to ascertain the exact window of compromise, the preliminary analysis suggests that criminals were siphoning the information between May 2017 to present. Based on the analysis of the available data, the entire network of Lord & Taylor and 83 Saks Fifth Avenue locations have been compromised. The majority of stolen credit cards were obtained from New York and New Jersey locations.

\* \* \*

With the declared number of compromised payment cards being in excess of five million, the current hacking attack is amongst the biggest and most damaging to ever hit retail companies.

With the declared number of compromised payment cards being in excess of five million, the current hacking attack is amongst the biggest and most damaging to ever hit retail companies.

Using our analytical tools, which were specifically developed in order to empower financial companies to monitor assets portfolio exposure within the deep & dark web, we have established with a high level of confidence that victims of the attack are Saks Fifth Avenue, Saks Fifth Avenue OFF 5TH, a discounted outlet of the luxury department store Saks Fifth Avenue, and Lord & Taylor Stores. Both companies are operated by Canadian retail business group Hudson's Bay Company (HBC). Despite the fact that HBC owns other retail brands, namely Galeria Kaufhof, and Home Outfitters, it appears that only Saks Fifth Avenue and Lord & Taylor were affected in this breach. The company also operates Gilt.com, a popular online shopping website.

As of this writing, only a minor part of compromised records have been offered for sale, with approximately 35,000 records for Saks Fifth Avenue and 90,000 records for Lord & Taylor.

Considering the rather standard practice of marketplace operators in releasing stolen data gradually in order to avoid oversaturation of the market and to minimize the chances of identification of stolen records by the banks, it will take at least several months before the entire archive is offered for sale. For example, in the previous breach of Jason's Deli Restaurants in December of 2017, the JokerStash syndicate has announced that they stole five million payment cards; however, up until now, only approximately a quarter of all payment cards were released for sale.

Despite the fact that the number of stolen records in both breaches is identical, the potential damage to cardholders could be significantly higher in the latest hacking attack. While diners at the affordable fast-food chain are less likely to purchase hi-end electronics like Apple computers and Microsoft Surface Books, which are coveted by cybercriminals for their high liquidity, it is also easier for banks to identify unusual shopping patterns and promptly block out-of-pattern transactions. However, cardholders who frequently shop at luxury retail chains like Saks Fifth Avenue are more likely to purchase high-ticket items regularly; therefore, it will be extremely difficult to distinguish fraudulent transactions from those of a

legitimate nature, allowing criminals to abuse stolen payment cards and remain undetected for a longer period of time.

**Analysis**

Based on the analysis of records that are currently available, it appears that all Lord & Taylor and 83 US based Saks Fifth Avenue locations have been compromised. In addition, we identified three potentially compromised stores located in Ontario, Canada. However, the majority of stolen credit cards were obtained from New York and New Jersey locations.

45.    On April 1, 2018, *The Wall Street Journal* reported in an article entitled "Saks, Lord & Taylor Hit With Data Breach; Millions of credit cards exposed by hackers; retailer says it has identified the problem" that:

Hackers breached the payment systems of Saks Fifth Avenue and Lord & Taylor department stores and stole credit card information for millions of shoppers, the latest in a series of intrusions that have exposed security gaps in corporate networks.

Hackers claim they have five million credit card and debit card numbers from the stores and have been releasing them for sale on the "dark web," a network of websites used by hackers and others to anonymously share information, according to Gemini Advisory LLC, a New York-based cybersecurity firm. The hackers began stealing the card numbers in May 2017, the firm estimates.

A spokesman for Hudson's Bay Co. of Canada, which owns the two chains, confirmed a security breach involving customer payment card data at its Saks Fifth Avenue, Saks Off 5th and Lord & Taylor chains in North America.

He said an investigation is ongoing and didn't say how many accounts were exposed. At this point, the company doesn't believe Social Security or driver's license numbers have been compromised and said it would notify any affected customers once it has completed its investigation.

"We have identified the issue, and have taken steps to contain it," the spokesman said, adding that the company is coordinating with law enforcement. Customers will be offered free identity protection services, including credit monitoring, and won't be liable for fraudulent charges, he said.

The retailer said there was no indication at this time that the breach affected its e-commerce operations, or other store brands it owns, including the Hudson's Bay department-store chain in Canada or Galeria Kaufhof in Germany.

So far, 125,000 cards that had been used at Saks or Lord & Taylor have been released for sale by the hackers, according to Gemini Advisory. Some were cards that were used by card owners as recently as last month in one of the affected stores, according to Dmitry Chorine, Gemini Advisory's chief technology officer.

The group behind the hack is known as JokerStash Syndicate or Fin 7. It appears to have penetrated the retailers' point of sale systems, Mr. Chorine said.

After previous breaches the JokerStash group has released credit-card data in smaller batches, to avoid flooding the market for illegally obtained payment credentials, Mr. Chorine said.

The incident is the latest in a string of hacks that have compromised consumer data….

\* \* \*

To make their systems more secure, retailers have been switching to a new form of payment called EMV, for Europay Mastercard and Visa, which uses a computer chip in the card to authenticate transactions.

Hudson's Bay said all Saks Fifth Avenue and Saks Off 5th stores had EMV systems installed by the fall of 2016, while Lord & Taylor stores were equipped with the system by February 2017.

The breach is the latest challenge for Hudson's Bay, which acquired Lord & Taylor in 2012 and Saks in 2013. Like other department store operators, it has been struggling with slowing or declining sales as shoppers buy more online, shift their preferences to specialty stores and spend more of their budgets on travel and entertainment.

In addition, Hudson's Bay has had to contend with an activist investor and a recent CEO switch. In February, the company hired CVS Health Inc. executive Helena Foulkes as chief executive, filling a position that was vacated last fall.

Last week, the company reported mixed results for its latest quarter, with same-store sales rising at Saks but falling at its department-store group and off-price division. Ms. Foulkes told analysts that

"everything is on the table" when it comes to fixing the business. "There are no sacred cows," she said on a conference call.

For the 12 months ended Feb. 3, the company reported a loss of 581 million Canadian dollars ($450 million) and total sales that were little changed at C$14.4 billion.

46.     Also on April 1, 2018, ABC News reported:

A data breach at department store chains Saks Fifth Avenue, Saks Off Fifth and Lord & Taylor has compromised the personal information of customers who shopped at the stores.

The chains' parent company, Canada-based Hudson's Bay Co., announced the breach of its store payment systems on Sunday. The company said it was investigating and taking steps to contain the attack.

The disclosure came after New York-based security firm Gemini Advisory LLC revealed on Sunday that a hacking group known as JokerStash or Fin7 began boasting last week that it was putting up for sale up to 5 million stolen credit and debit cards. The hackers named their stash BIGBADABOOM-2. While the extent of its holdings remains unclear, about 125,000 records were immediately released for sale.

The security firm confirmed with several banks that many of the compromised records came from Saks and Lord & Taylor customers.

Hudson's Bay said in a statement that it "deeply regrets any inconvenience or concern this may cause," but it hasn't said how many Saks or Lord & Taylor stores or customers were affected. The company said there's no indication that the breach affected its online shopping websites or other brands, including the Home Outfitters chain or Hudson's Bay stores in Canada.

The company said customers won't be liable for fraudulent charges. It plans to offer free credit monitoring and other identity protection services.

There is evidence that the breach began about a year ago, said Dmitry Chorine, Gemini Advisory's co-founder and chief technology officer. He said the prolific hacking group has previously targeted major hotel and restaurant chains.

The breach follows last year's high-profile hack of credit bureau Equifax that exposed the personal data of millions of Americans.

This newest breach, however, more closely resembles past retail breaches that have targeted the point-of-sale systems used by companies from Home Depot to Target and Neiman Marcus.

Chorine said the hackers' typical method is to send cleverly crafted phishing emails to company employees, especially managers, supervisors and other key decision-makers. Once an employee clicks on an attachment, which is often made to look like an invoice, the system gets infected.

"For an entire year, criminals were able to sit on the network of Lord & Taylor and Saks and steal data," he said.

Chorine said most of the stolen credit cards appear to have been obtained from stores in the New York City metropolitan area and other Northeast U.S. states. It's possible, he said, that those stores hadn't yet adopted the more secure credit card payment systems that have been rolled out elsewhere.

Hudson's Bay is advising customers who want more information about the breach to visit security-response websites it's created for Saks Fifth Avenue, Saks Off Fifth, and Lord & Taylor.

47.     As of April 2, 2018, substantially identical messages appear in the three websites identified in the April 1, 2018, Press Release. The substantially identical messages state (as copied from https://www.saksoff5th.com/include/aem/aem_static.jsp?page=security-information-notice&site_refer=EML):

**April 2, 2018**

**Updated Statement**

We recently became aware of a data security issue involving customer payment card data at certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores in North America. We identified the issue, took steps to contain it, and believe it no longer poses a risk to customers shopping at our stores. While the investigation is ongoing, there is no indication that this affects our e-commerce or other digital platforms, Hudson's Bay, Home Outfitters, or HBC Europe. We deeply regret any inconvenience or concern this may cause.

We wanted to reach out to our customers quickly to assure them that they will not be liable for fraudulent charges that may result from this matter. Once we have more clarity around the facts, we will

notify our customers quickly and will offer those impacted free identity protection services, including credit and web monitoring. We encourage our customers to review their account statements and contact their card issuers immediately if they identify activity or transactions they do not recognize.

We are working rapidly with leading data security investigators to get our customers the information they need, and our investigation is ongoing. We also are coordinating with law enforcement authorities and the payment card companies. For further information, please visit https://www.saksfifthavenue.com/security-information/notice.html, https://www.saksoff5th.com/security-information/notice.html, or https://www.lordandtaylor.com/security-information/notice.html. To speak with a dedicated call center representative, beginning April 4, 2018, you can call 1-855-270-9187, Monday – Saturday, 8 am – 8 pm CT.

## FAQs

### 1. What happened?

We recently became aware of a data security issue involving customer payment card data at certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores in North America. We identified the issue, took steps to contain it, and believe it no longer poses a risk to customers shopping at our stores. While the investigation is ongoing, there is no indication at this time that this affects our e-commerce or other digital platforms, Hudson's Bay, Home Outfitters, or HBC Europe. We are working rapidly with leading data security investigators to get our customers the information they need, and our investigation is ongoing. We also are coordinating with law enforcement authorities and the payment card companies.

### 2. What are you doing about it?

We identified the issue, took steps to contain it, and believe it no longer poses a risk to customers shopping at our stores.

We will offer those impacted free identity protection services, including credit and web monitoring.

### 3. How do I know if my payment card data was affected by this issue?

Once we have more clarity around the facts, we will notify our customers quickly and will offer those impacted free identity protection services, including credit and web monitoring. We encourage our customers to review their account statements and

contact their card issuers immediately if they identify activity or transactions they do not recognize.

**4. Will I be liable for fraudulent charges that may result from this matter?**

We want to assure our customers that they will not be liable for fraudulent charges that may result from this matter. We encourage our customers to review their account statements and contact their card issuers immediately if they identify activity or transactions they do not recognize.

We will offer those impacted free identity protection services, including credit and web monitoring.

**5. Have Social Security or Social Insurance numbers, driver's license numbers, or PINs been affected by this issue?**

There is no indication based on our investigation that Social Security or Social Insurance numbers, driver's license numbers, or PINs have been affected by this issue.

**6. What should I do now?**

It's always a good practice for customers to closely monitor their account statements. If you see an unauthorized charge or a charge you do not recognize, you should notify your card issuer immediately.

**7. When will you be able to share more information?**

Our investigation is ongoing, and we will do so once we have more clarity around the facts. To speak with a dedicated call center representative, beginning April 4, 2018, you can call 1-855-270-9187, Monday – Saturday, 8 am – 8 pm CT. We will provide additional information to our customers through our websites.

**April 1, 2018 Statement**

We have become aware of a data security issue involving customer payment card data at certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores in North America. While the investigation is ongoing, there is no indication at this time that this affects our e-commerce or other digital platforms, Hudson's Bay, Home Outfitters, or HBC Europe. We deeply regret any inconvenience or concern this may cause.

We wanted to reach out to our customers quickly to assure them that they will not be liable for fraudulent charges that may result from this matter. We have identified the issue, and have taken steps to contain it. Once we have more clarity around the facts, we will notify our customers quickly and will offer those impacted free identity protection services, including credit and web monitoring. We encourage our customers to review their account statements and contact their card issuers immediately if they identify activity or transactions they do not recognize.

We are working rapidly with leading data security investigators to get our customers the information they need, and our investigation is ongoing. We also are coordinating with law enforcement authorities and the payment card companies. For further information, please visit                          https://www.saksfifthavenue.com/security-information/notice.html,        https://www.saksoff5th.com/security-information/notice.html, or https://www.lordandtaylor.com/security-information/notice.html. In the coming days, customer care representatives will be available through a dedicated call center to provide further information.

FAQs

1. What happened?

We have become aware of a data security issue involving customer payment card data at certain Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores in North America. While the investigation is ongoing, there is no indication at this time that this affects our e-commerce or other digital platforms, Hudson's Bay, Home Outfitters, or HBC Europe. We are working rapidly with leading data security investigators to get our customers the information they need, and our investigation is ongoing. We also are coordinating with law enforcement authorities and the payment card companies.

2. What are you doing about it?

We have identified the issue, and have taken steps to contain it. We will offer those impacted free identity protection services, including credit and web monitoring.

3. How do I know if my payment card data was affected by this issue?

Once we have more clarity around the facts, we will notify our customers quickly and will offer those impacted free identity protection services, including credit and web monitoring. We encourage our customers to review their account statements and

contact their card issuers immediately if they identify activity or transactions they do not recognize.

4. Will I be liable for fraudulent charges that may result from this matter?

We want to assure our customers that they will not be liable for fraudulent charges that may result from this matter. We encourage our customers to review their account statements and contact their card issuers immediately if they identify activity or transactions they do not recognize.

We will offer those impacted free identity protection services, including credit and web monitoring.

5. Have Social Security or driver's license numbers been affected by this issue?

There is no indication based on our investigation that Social Security or driver's license numbers have been affected by this issue.

6. What should I do now?

It's always a good practice for customers to closely monitor their account statements. If you see an unauthorized charge or a charge you do not recognize, you should notify your card issuer immediately.

7. When will you be able to share more information?

Our investigation is ongoing, and we will do so once we have more clarity around the facts. In the coming days, we will provide additional information to our customers through our websites and a dedicated call center.

48.     Plaintiffs and members of the classes defined below have or will suffer actual injury as a direct result of HBC's data breach. In addition to fraudulent charges and damage to their credit, many victims spent or will spend substantial time and expense relating to:

a.     Finding fraudulent charges;

b.     Canceling and reissuing cards;

c.     Purchasing credit monitoring and identity theft prevention;

d.      Addressing their inability to withdraw funds linked to compromised accounts;

e.      Removing withdrawal and purchase limits on compromised accounts;

f.      Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.      Spending time on the phone with or at the financial institution to dispute fraudulent charges;

h.      Resetting automatic billing instructions; and

i.      Paying late fees and declined payment fees imposed as a result of failed automatic payments.

49.      As a direct and proximate result of HBC's conduct, Plaintiffs and the Class have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs now have to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Moreover, Plaintiffs and the Class have an interest in ensuring that their information, which remains in the possession of HBC, is protected from further breaches by the implementation of security measures and safeguards.

50.      Plaintiffs and the Class have suffered, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.      Trespass, damage to and theft of their personal property including personal information and PCD;

b.      Improper disclosure of their personal information and PCD property;

c.      The imminent and certainly impending injury flowing from potential fraud and identity theft posed by customers' personal information and PCD being placed in the hands of criminals and having been already misused via the sale of such information on the Internet black market;

d.      Damages flowing from HBC's untimely and inadequate notification of the data breach;

e.      Loss of privacy suffered as a result of the data breach;

f.      Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

g.      Ascertainable losses in the form of deprivation of the value of customers' personal information for which there is a well-established and quantifiable national and international market; and

h.      The loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money customers were permitted to obtain from their accounts.

## CLASS ALLEGATIONS

### Statewide Classes

51.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs assert their claims that HBC violated state consumer statutes on behalf of separate statewide classes, defined as follows:

**New York Consumer Protection Class:**

All persons damaged by acts occurring in New York whereby their personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

**New Jersey Consumer Protection Class:**

All residents of New Jersey whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

**Florida Consumer Protection Class:**

All residents of Florida whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

52.     Plaintiffs assert the state consumer law claims under the listed consumer protection laws of New York, New Jersey and Florida.

**State Common Law Classes**

53.     Pursuant to Fed. R. Civ. P. 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims for negligence (Count II), negligence per se (Count III), breach of implied contract (Count IV), unjust enrichment (Count V), and declaratory judgment (Count VI) under the laws of the individual states of the United States, and on behalf of separate statewide classes, defined as follows:

**New York Negligence, Negligence Per Se, Breach of Implied Contract, Unjust Enrichment, and/or Declaratory Judgment Class:**

All residents of New York whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

**New Jersey Negligence, Negligence Per Se, Breach of Implied Contract, Unjust Enrichment, and/or Declaratory Judgment Class:**

All residents of New Jersey whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

**Florida Negligence, Negligence Per Se, Breach of Implied Contract, Unjust Enrichment, and/or Declaratory Judgment Class:**

> All residents of Florida whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

54.     Plaintiffs assert the state common law claims under the laws of New York, New Jersey and Florida.

**Nationwide Class**

55.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs assert an alternative claim under the New York Gen. Bus. Law § 349 (Count I), and for common law claims for negligence (Count II), negligence per se (Count III), breach of implied contract (Count IV), unjust enrichment (Count V), and declaratory judgment (Count VI) on behalf of a nationwide class, defined as follows:

> **Nationwide Class:**
>
> All residents of the United States whose personal information was compromised as a result of the data breach first disclosed by HBC on April 1, 2018.

56.     As alleged herein, HBC issued the press release from New York, HBC maintains flagship stores in New York, and it appears that the majority of stolen credit cards were obtained from New York and New Jersey locations of HBC stores. Applying New York law, therefore, comports with due process.

57.     Excluded from each of the above Classes are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as his or her judicial staff and immediate family members.

58.     Each of the proposed classes meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3):

59.     **Numerosity.** The proposed classes include many thousands to millions of customers whose data was compromised in the data breach. While the precise number of Class members in each proposed class has not yet been determined, the massive size of the Data Breach indicates that joinder of each member would be impracticable.

60.     **Commonality.** Common questions of law and fact exist and predominate over any questions affecting only individual Class members. The common questions include:

a.      Whether HBC engaged in the conduct alleged herein;

b.      Whether HBC's conduct constituted Deceptive Trade Practices (as defined below) actionable under the applicable consumer protection laws;

c.      Whether HBC had a legal duty to adequately protect Plaintiffs' and Class members' personal information;

d.      Whether HBC breached its legal duty by failing to adequately protect Plaintiffs' and Class members' personal information;

e.      Whether HBC had a legal duty to provide timely and accurate notice of the data breach to Plaintiffs and Class members;

f.      Whether HBC breached its duty to provide timely and accurate notice of the data breach to Plaintiffs and Class members;

g.      Whether and when HBC knew or should have known that Plaintiffs' and Class members' personal information stored on its computer systems was vulnerable to attack;

h.      Whether Plaintiffs and Class members are entitled to recover actual damages and/or statutory damages; and

i.      Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

61.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class. Consumer Plaintiffs and Class members were injured through HBC's uniform misconduct and their legal claims arise from the same core HBC practices.

62.    **Adequacy.** Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the Class members they seek to represent. Plaintiffs' counsel are very experienced in litigating consumer class actions and complex commercial disputes, and include lawyers who have successfully prosecuted similarly massive retail data breach cases.

63.    **Superiority.** A class action is superior to all other available methods of fairly and efficiently adjudicating this dispute. The injury sustained by each Class member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against HBC. Even if it were economically feasible, requiring millions of injured plaintiffs to file individual suits would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

64.    Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2). HBC has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

65. Finally, all members of the purposed Classes are readily ascertainable. HBC has access to addresses and other contact information for millions of members of the Classes, which can be used to identify Class members.

## VIOLATIONS OF NEW YORK'S CONSUMER PROTECTION LAWS OR N.Y. GEN. BUS. LAW § 349

### COUNT I

### (ON BEHALF OF PLAINTIFFS, THE NEW YORK SUBCLASS, AND THE NATIONWIDE CLASS)

66. Plaintiff Raschella realleges, as if fully set forth, the allegations of the preceding paragraphs.

67. Defendants' practices, acts, policies and course of conduct, as described herein, including making representations that it possessed sufficient security to maintain the privacy of such PII, were intended to induce, and did induce, Plaintiffs, the Nationwide Class, and the New York Sub-Class to provide their sensitive PII to HBC.

68. Plaintiffs, the Nationwide Class, and the New York Sub-Class never would have provided their sensitive and personal PII if they had been told or knew that HBC failed to maintain sufficient security to keep such PII from being hacked and taken by others, that HBC failed to maintain the information in encrypted form.

69. HBC's practices, acts, policies and course of conduct are actionable in that:

a. HBC actively and knowingly misrepresented or omitted disclosure of material information to Plaintiffs, the Nationwide Class, and the New York Sub-Class at the time they provided such PII information that HBC did not have sufficient security or mechanisms to protect PII; and

b. HBC failed to give adequate warnings and notices regarding the defects and problems with its system(s) of security systems that it maintained to protect Plaintiffs', the

Nationwide Class's, and the New York Sub-Class's PII. HBC possessed prior knowledge of the inherent defects in its IT systems and failed to address the same or to give adequate and timely warnings that there had been a Data Breach and hacking episodes had occurred.

70.    The aforementioned conduct is and was deceptive, false, and fraudulent and constitutes an unconscionable commercial practice in that HBC has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the defective security system it maintained and failed to reveal the Data Breach timely and adequately.

71.    Members of the public were deceived by and relied upon HBC's affirmative misrepresentations and failures to disclose.

72.    Such acts by HBC are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer providing their PII to HBC. Said deceptive acts and practices aforementioned are material. The requests for and use of such PII materials in New York and concerning New York residents and/or citizens was a consumer-oriented act and thereby falls under the New York consumer fraud statute, General Business Law § 349.

73.    HBC's wrongful conduct caused Plaintiffs, the Nationwide Class, and the New York Sub-Class to suffer a consumer-related injury by causing them to incur substantial expense to protect from misuse of the PII materials by third parties and placing Plaintiffs, the Nationwide Class, and the New York Sub-Class at serious risk for monetary damages.

74.    In addition to or in lieu of actual damages, because of the injury, Plaintiffs, the Nationwide Class, and the Sub-Class seek statutory damages for each injury and violation which has occurred.

75.     Moreover, Defendant's insufficient security practices were designed, established, and initiated, at least in part from New York, the April 1, 2018, Press Release was issued from New York, and the sufficiency of Defendants' security practices was uniformly relied upon by consumers nationwide when they used PCD to make purchases with Defendants.

76.     Therefore, New York has a legitimate interest in applying its laws to adjudicate this dispute and to ensure that its residents comply with its consumer protection laws while conducting business in New York.

77.     Accordingly, New York law has significant contacts to the claims asserted by this class so that application of its consumer fraud laws to all class claimants is not arbitrary, capricious, or unfair and is not a violation of due process.

## NEGLIGENCE

## COUNT II

### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE NEGLIGENCE CLASSES)

78.     Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

79.     HBC solicited, gathered, and stored personal information, including PCD, of Plaintiffs and the Nationwide Negligence Class or, alternative, the Separate Statewide Negligence Classes (collectively, the "Class" as used in this Count) to facilitate sales transactions.

80.     HBC knew, or should have known, of the risks inherent in collecting and storing the personal information of Plaintiffs and the Class and the importance of adequate security. HBC received warnings from within and outside the company that hackers routinely attempted to access personal information, and PCD in particular, without authorization. HBC also knew about numerous, well-publicized data breaches by other national retailer and restaurant chains.

81.    HBC owed duties of care to Plaintiffs and the Class whose personal information was entrusted to it. HBC's duties included the following:

a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting personal information and PCD in its possession;

b.    To protect customers' personal information and PCD using reasonable and adequate security procedures and systems that are compliant with the PCI-DSS standards and consistent with industry-standard practices;

c.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

d.    To promptly notifying Plaintiffs and Class members of the data breach.

82.    Because HBC knew that a breach of its systems would damage millions of its customers, including Plaintiffs and Class members, it had a duty to adequately protect their personal information.

83.    HBC owed a duty of care not to subject Plaintiffs and the Class to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

84.    HBC knew, or should have known, that its computer systems did not adequately safeguard the personal information of Plaintiffs and the Class.

85.    HBC breached its duties of care by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the personal information of Plaintiffs and the Class.

86.    HBC breached its duties of care by failing to provide prompt notice of the data breach to the persons whose personal information was compromised.

87.     HBC acted with reckless disregard for the security of the personal information of Plaintiffs and the Class because HBC knew or should have known that its computer systems and data security practices were not adequate to safeguard the personal information that that it collected and stored, which hackers were attempting to access.

88.     HBC acted with reckless disregard for the rights of Plaintiffs and the Class by failing to provide prompt and adequate notice of the data breach so that they could take measures to protect themselves from damages caused by the fraudulent use the personal information compromised in the data breach.

89.     HBC had a special relationship with Plaintiffs and the Class. Plaintiffs' and the Class' willingness to entrust HBC with their personal information was predicated on the understanding that HBC would take adequate security precautions. Moreover, only HBC had the ability to protect its systems (and the personal information that it stored on them) from attack.

90.     HBC own conduct also created a foreseeable risk of harm to Consumer Plaintiffs and Class members and their personal information. HBC's misconduct included failing to:

a.      Secure its point-of-sale systems;

b.      Secure access to its servers;

c.      Comply with industry standard security practices;

d.      Follow the PCI-DSS standards;

e.      Encrypt PCD at the point-of-sale and during transit;

f.      Employ adequate network segmentation;

g.      Implement adequate system and event monitoring;

h.      Utilize modern payment systems that provided more security against intrusion;

        i.      Install updates and patches in a timely manner; and

        j.      Implement the systems, policies, and procedures necessary to prevent this type of data breach.

91.     HBC also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and the Class' personal information and promptly notify them about the data breach.

92.     HBC breached the duties it owed to Consumer Plaintiffs and Class members in numerous ways, including:

        a.      By creating a foreseeable risk of harm through the misconduct previously described;

        b.      By failing to implement adequate security systems, protocols and practices sufficient to protect their personal information both before and after learning of the data breach;

        c.      By failing to comply with the minimum industry data security standards, including the PCI-DSS, during the period of the data breach; and

        d.      By failing to timely and accurately disclose that the personal information of Plaintiffs and the Class had been improperly acquired or accessed.

93.     But for HBC's wrongful and negligent breach of the duties it owed Plaintiffs and the Class members, their personal and financial information either would not have been compromised or they would have been able to prevent some or all of their damages.

94.     As a direct and proximate result of HBC's negligent conduct, Plaintiffs and the Class have suffered damages and are at

95.     The injury and harm that Consumer Plaintiffs and Class members suffered (as alleged above) was reasonably foreseeable.

96.     The injury and harm that Consumer Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of HBC's negligent conduct.

97.     Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## NEGLIGENCE PER SE

## COUNT III

**(ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE NEGLIGENCE CLASSES)**

98.     Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

99.     Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, HBC had a duty to provide fair and adequate computer systems and data security to safeguard the personal information, including PCD, of Plaintiffs and the Nationwide Negligence Class or, alternative, the Separate Statewide Negligence Per Se Classes (collectively, the "Class" as used in this Count)

100.    The FTCA prohibits "unfair … practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as HBC, of failing to use reasonable measures to protect personal information. The FTC publications and orders described above also form part of the basis of HBC's duty in this regard.

101.    HBC solicited, gathered, and stored personal information, including PCD, of Plaintiffs and the Class to facilitate sales transactions which affect commerce.

102.    HBC violated the FTCA by failing to use reasonable measures to protect personal information of Plaintiffs and the Class and not complying with applicable industry standards, as described herein.

103.    HBC's violation of the FTCA constitutes negligence *per se*.

104.    Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

105.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

106.    As a direct and proximate result of HBC's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries damages arising from their inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the data breach and/or false or fraudulent charges stemming from the data breach, including but not limited to late fees charges; damages from lost time and effort to mitigate the actual and potential impact of the data breach on their lives including, *inter alia*, by contacting their financial institutions to place to dispute fraudulent charges, closing or modifying financial accounts, closely reviewing and monitoring their accounts for unauthorized activity which is certainly impending.

107.    Laws in the following states in which there are HBC stores place a duty on HBC to implement and maintain reasonable security procedures and practices to safeguard customers' personal information:

a.    California: Cal Civ. Code § 1798.81.5;

b.    Connecticut: Conn. Gen. Stat. § 42-471;

c.    Florida: Fla. Stat. § 501.171(2);

d.    Indiana: Ind. Code § 24-4.9-3.5;

      e.       Maryland: Md. Code. Comm. Law § 14-5303;

      f.       Massachusetts: Mass. Gen Laws Ch. 93H, § 3(a);

      g.       Nevada: Nev. Rev. Stat. § 603A.210; and

      h.       Texas: Tex. Bus. & Com. Code § 521.052(a).

108.    HBC either used the same computer systems and security practices in all states in which it maintains stores or negligently attempted to cut costs by exposing customer data in states where it did not feel obliged to follow best-practices.

109.    HBC breached its duties to Plaintiffs and the Class under these states' laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class' personal information.

110.    HBC's violation of the FTCA constitutes negligence *per se*.

## BREACH OF IMPLIED CONTRACT

## COUNT IV

### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE BREACH OF IMPLIED CONTRACT CLASSES)

111.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

112.    When Plaintiffs and the members of the Nationwide class or, alternatively, the members of the Separate Statewide Breach of Implied Contract Classes (collectively, the "Class" as used in this Count), provided their personal information to HBC in making purchases at HBC stores, they entered into implied contracts by which HBC agreed to protect their personal information and timely notify them in the event of a data breach.

113.    HBC invited its customers, including Plaintiffs and the Class, to make purchases at its locations using payment cards in order to increase sales by making purchases more convenient.

114.    An implicit part of the offer was that HBC would safeguard the personal information using reasonable or industry-standard means and would timely notify Plaintiffs' and the Class in the event of a data breach.

115.    HBC also affirmatively represented that it would "continually review and enhance security" after a prior data leak.

116.    Based on the implicit understanding and also on HBC's representation, Plaintiffs and the Class accepted the offers and provided HBC with their personal information by using their payment cards in connection with purchases at HBC locations during the period of the data breach.

117.    Plaintiffs and Class members would not have provided their personal information to HBC had they known that HBC would not safeguard their personal information as promised or provide timely notice of a data breach.

118.    Plaintiffs and Class members fully performed their obligations under the implied contracts with HBC.

119.    HBC breached the implied contracts by failing to safeguard Plaintiffs' and Class members' personal information and failing to provide them with timely and accurate notice when their personal information was compromised in the data breach.

120.    The losses and damages Plaintiffs and Class members sustained (described above) were the direct and proximate result of HBC's breaches of its implied contracts with them.

## UNJUST ENRICHMENT

## COUNT V

### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE SEPARATE STATEWIDE UNJUST ENRICHMENT CLASSES)

121.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

122.    Plaintiffs and members of the Nationwide class or, alternatively, the members of the Separate Statewide Unjust Enrichment Classes (collectively, the "Class" as used in this Count), conferred a monetary benefit on HBC. Specifically, they made purchases from HBC and provided HBC with their personal information by using their payment cards for the purchases that they would not have made if they had known that HBC did not provide adequate protection of their personal information.

123.    HBC knew that Plaintiffs and the Class conferred a benefit on HBC. HBC profited from their purchases and used their personal information for its own business purposes.

124.    HBC failed to secure the Plaintiffs' and Class members' personal information, and, therefore, was unjustly enriched by the purchases made by Plaintiffs and the Class that they would not have made had they known that HBC did not keep their personal information secure.

125.    Plaintiffs and the Class have no adequate remedy at law.

126.    Under the circumstances, it would be unjust for HBC to be permitted to retain any of the benefits that Plaintiffs and Class members of the Class conferred on it.

127.    HBC should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and Class members proceeds that it unjustly received from them. In the alternative, HBC should be compelled to refund the amounts that Plaintiffs and the Class overpaid.

## DECLARATORY JUDGMENT

## COUNT VI

## (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS OR, ALTERNATIVELY, THE SEPARATE STATEWIDE NEGLIGENCE AND BREACH OF IMPLIED CONTRACT CLASSES)

128.    Plaintiffs reallege, as if fully set forth, the allegations of the preceding paragraphs.

129.    Plaintiffs and members of the Breach of Implied Contract classes entered into an implied contract that required HBC to provide adequate security for the personal information it collected from their payment card transactions.

130.    HBC owes duties of care to Plaintiffs and the members of the Nationwide class or, alternatively, the separate statewide Negligence classes that require it to adequately secure personal information.

131.    HBC still possesses personal information regarding the Plaintiffs' and the Class members.

132.    Since the data breach, HBC has announced no changes to its data security to fix the vulnerabilities in its systems which permitted the intrusions and to prevent further attacks.

133.    Accordingly, HBC still has not satisfied its contractual obligations and legal duties to Plaintiffs and the Breach of Implied Contract and Negligence Classes. In fact, now that HBC's lax approach towards information security, possibly as a result of cost-cutting, has become public, the personal information in HBC's possession is more vulnerable than previously.

134.    Actual harm has arisen in the wake of HBC's data breach regarding its contractual obligations and duties of care to provide security measures to Plaintiffs and the members of the Breach of Implied Contract and Negligence Classes. Further, Plaintiffs and the members of the Breach of Implied Contract and Negligence Classes are at risk of additional or further harm due to the exposure of their personal information and HBC's failure to address the security failings that lead to such exposure.

135.    There is no reason to believe that HBC's security measures are any more adequate than they were before the breach to meet HBC's contractual obligations and legal duties, and

there is no reason to think HBC has no other security vulnerabilities that have not yet been knowingly exploited.

136.    Plaintiffs, therefore, seek a declaration (1) that HBC's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, HBC must implement and maintain reasonable security measures, including, but not limited to:

a.    ordering that HBC engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on HBC's systems on a periodic basis, and ordering HBC to promptly correct any problems or issues detected by such third-party security auditors;

b.    ordering that HBC engage third-party security auditors and internal personnel to run automated security monitoring;

c.    ordering that HBC audit, test, and train its security personnel regarding any new or modified procedures;

d.    ordering that HBC segment customer data by, among other things, creating firewalls and access controls so that if one area of HBC is compromised, hackers cannot gain access to other portions of HBC's systems;

e.    ordering that HBC purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f.    ordering that HBC conduct regular database scanning and securing checks;

43

g.      ordering that HBC routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.      ordering HBC to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps HBC customers must take to protect themselves.

## VIOLATION OF FLORIDA'S UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*)

### COUNT VII

### (ON BEHALF OF PLAINTIFF LEFKOWITZ AND THE FLORIDA SUBCLASS)

137.    Plaintiff Lefkowitz realleges, as if fully set forth, the allegations of the preceding paragraphs.

138.    At all relevant times, Florida Subclass members were "consumers" within the meaning of FDUPTA.

139.    HBC is engaged in trade and commerce in Florida.

140.    Plaintiff and Class members entrusted HBC with their PII.

141.    As alleged herein this Complaint, HBC engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including the following, in violation of the FDUTPA:

a.      failure to maintain the security of credit and/or debit card account information;

b.      failure to maintain adequate computer systems and data security practices to safeguard credit and debit card information and other PII;

c.      failure to disclose that its computer systems and data security practices were inadequate to safeguard credit and debit card information and other PII from theft;

d.      continued acceptance of PII and storage of other personal information after HBC knew or should have known of the security vulnerabilities of the systems that were exploited in the Data Breach;

e.      allowing unauthorized persons to have access to and make unauthorized charges to its customers' credit and/or debit card accounts.

142.    HBC knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiff and Class members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

143.    As a direct and proximate result of HBC's violation of the FDUTPA, Plaintiff Lefkowitz and Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the PII of Plaintiff and Class Members; damages arising from their inability to use their debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental

consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

144.    Also as a direct result of HBC's knowing violation of the FDUTPA, Plaintiff Lefkowitz and Class members are entitled to damages as well as injunctive relief, including, but not limited to:

a.    Ordering that HBC engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on HBC's systems on a periodic basis, and ordering HBC to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering that HBC engage third-party security auditors and internal personnel to run automated security monitoring;

c.    Ordering that HBC audit, test, and train its security personnel regarding any new or modified procedures;

d.    Ordering that HBC segment PII by, among other things, creating firewalls and access controls so that if one area of HBC is      compromised, hackers cannot gain access to other portions of HBC systems;

e.    Ordering that HBC purge, delete, and destroy in a reasonable secure manner PII not necessary for its provisions of services;

f.    Ordering that HBC conduct regular database scanning and securing checks;

g.    Ordering that HBC routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.    Ordering HBC to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps HBC customers must take to protect themselves.

145.    Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and Class members and the public from HBC's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. HBC's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

146.    Plaintiff Lefkowitz and the Florida Subclass seek actual damages under Fla. Stat. § 501.211 (2) and all fees, costs, and expenses allowed by law, including attorney's fees and costs, pursuant to Federal Rule of Civil Procedure 23 and Fla. Stat. §§ 501.2105 and 501.211, to be proven at trial.

## VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

## COUNT VIII

### (ON BEHALF OF PLAINTIFF TAFET AND THE NEW JERSEY SUB-CLASS)

147.    Plaintiff Tafet realleges, as if fully set forth, the allegations of the preceding paragraphs.

148.    As alleged herein this Complaint, HBC, while operating in New Jersey, engaged in unconscionable commercial practices, deception, misrepresentation, and the knowing

concealment, suppression, and omission of material facts with intent that others rely on such concealment, suppression, and omission, in connection with the sale and advertisement of services, in violation of N.J. Stat. Ann. § 56.8-2. This includes, but is not limited to the following:

a.    failure to maintain the security of credit and/or debit card account information;

b.    failure to maintain adequate computer systems and data security practices to safeguard credit and debit card information and other PII;

c.    failure to disclose that its computer systems and data security practices were inadequate to safeguard credit and debit card information and other PII from theft;

d.    continued acceptance of PII and storage of other personal information after HBC knew or should have known of the security vulnerabilities of the systems that were exploited in the Data Breach;

e.    allowing unauthorized persons to have access to and make unauthorized charges to its customers' credit and/or debit card accounts.

149.    HBC knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiff Tafet and Class members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

150.    As a direct and proximate result of HBC's violation of the New Jersey Consumer Fraud Act, Plaintiff and Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the PII of Plaintiff and Class Members; damages arising

from their inability to use their debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

151.    Also as a direct result of HBC's knowing violation of the New Jersey Consumer Fraud Act, Plaintiff Tafet and Class members are entitled to damages as well as injunctive relief, including, but not limited to:

a.    Ordering that HBC engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on HBC's systems on a periodic basis, and ordering HBC to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering that HBC engage third-party security auditors and internal personnel to run automated security monitoring;

c.    Ordering that HBC audit, test, and train its security personnel regarding any new or modified procedures;

       d.      Ordering that HBC segment PII by, among other things, creating firewalls and access controls so that if one area of HBC is     compromised, hackers cannot gain access to other portions of HBC systems;

       e.      Ordering that HBC purge, delete, and destroy in a reasonable secure manner PII not necessary for its provisions of services;

       f.      Ordering that HBC conduct regular database scanning and securing checks;

       g.      Ordering that HBC routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

       h.      Ordering HBC to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps HBC customers must take to protect themselves.

152.    Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and Class members and the public from HBC's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. HBC's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

153.    Plaintiff and the New Jersey Subclass also seeks actual damages, injunctive and/or other equitable relief and treble damages, and attorney's fees and costs pursuant to Federal Rule of Civil Procedure 23 and N.J. Stat. Ann. § 56:8-19.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

A.     An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.     A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, punitive damages, statutory damages, equitable relief, restitution, disgorgement, attorney's fees, statutory costs, and such other and further relief as is just and proper.

C.     An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

D.     An order requiring HBC to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

E.     A judgment in favor of Plaintiffs and the Classes awarding them pre-judgment and post judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

F.     An award of such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all triable issues.

DATED: April 4, 2018                Respectfully Submitted,

 /s/ *Howard T. Longman*
Howard T. Longman
Melissa R. Emert
Michael J. Klein
**STULL, STULL, & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email:  hlongman@ssbny.com
          memert@ssbny.com
          mklein@ssbny.com

*Attorneys for Plaintiffs*